**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**NORTHERN COLORADO WATER CONSERVANCY DISTRICT et al.,
Defendants-Appellees,**

and

**City and County of Denver, a Municipal Corporation, Defendant-Appellant.**

**No. 78–1378.**

United States Court of Appeals,
Tenth Circuit.

Argued Sept. 13, 1979.

Decided Oct. 29, 1979.

Glenn G. Saunders, Denver, Colo. (John M. Dickson, Denver, Colo., with him on brief), of Saunders, Snyder, Ross & Dickson, P. C., Denver, Colo. (Wayne D. Williams and Michael L. Walker, Denver, Colo., with him on brief) for defendant-appellant City and County of Denver.

John R. Little, Jr., Regional Sol., Dept. of the Interior, Denver, Colo. (Ralph O. Canaday, Atty., Dept. of the Interior, Denver, Colo., James W. Moorman, Asst. Atty. Gen., Washington, D.C., Joseph F. Dolah, U. S. Atty., Jerre W. Dixon, Asst. U. S. Atty., Denver, Colo. and Robert L. Klarquist, Hank Meshorer, John J. Zimmerman, Attys., Dept. of Justice, Washington, D.C., Hank Meshorer, Senior Trial Atty., Dept. of Justice, Denver, Colo., with him on brief), for plaintiff-appellee United States of America.

Donald E. Phillipson, Denver, Colo. (John M. Sayre, Denver, Colo., with him on brief) of Davis, Graham & Stubbs, Denver, Colo., for defendant-appellee Northern Colorado Water Conservancy District.

Kenneth Balcomb, Glenwood Springs, Colo. (Scott Balcomb, Glenwood Springs, Colo., with him on brief) of Delaney & Balcomb, Glenwood Springs, Colo., for defendant-appellee Colorado River Water Conservation District.

Stanley W. Cazier of Baker & Cazier, Granby, Colo., on brief, for defendant-appellee Middle Park Water Conservancy District.

William H. Nelson and Frederick G. Aldrich, of Nelson, Hoskin, Groves & Prinster, Grand Junction, Colo., on brief, for defendant-appellee Grand Valley Irrigation Company.

Before McWILLIAMS, BARRETT and LOGAN, Circuit Judges.

BARRETT, Circuit Judge.

Denver appeals from a memorandum opinion and order whereby the United States' motion to compel Denver to release 28,622 acre feet of water to Green Mountain Reservoir was granted, and Denver's Motion for Declaratory Judgment seeking a judgment "declaring that Denver has a right to require the United States to refrain from the use of Green Mountain Reservoir or the water stored therein or the demands on the Blue River created thereby for the exercise of its storage right for the purposes of generating electric energy to the extent that Denver requires such water for domestic use and pays or tenders payment therefor in electric energy as provided for in the Decree herein" was denied.

This case marks another chapter in a protracted, continuing legal saga seeking the delineation and adjudication of certain water rights between Colorado's western and eastern watersheds. A review of the litigative background is necessary.

Over the years a number of projects have been undertaken to allocate Colorado's available water between the western slope, which because of the mountains, receives the greater part of Colorado's precipitation, and the eastern slope, which is more developed in terms of population, industrial growth and irrigable land. Thus, the eastern slope is in need of more water. The Colorado-Big Thompson Project involved herein was authorized by Congress in 1937. It became operational in 1943 as an effort to augment the supply of water then available in northeastern Colorado while at the same time protecting the present and future needs of western Colorado.

Within the Project is the Green Mountain Reservoir, a storage facility located on the Blue River, operated by the United States Department of the Interior, Bureau of Reclamation in accordance with Senate Document No. 80, 75th Congress, 1st Session (1937). Under Senate Document No. 80, the heading "Manner of Operation of Project Facilities and Auxiliary Features", provided that the project "must be operated in such a manner as to most nearly effect the following primary purposes:

1. To preserve the vested and future rights in irrigation.

2. To preserve the fishing and recreational facilities and the scenic attractions of Grand Lake, the Colorado River, and the Rocky Mountain National Park.

3. To preserve the present surface elevations of the water in Grand Lake and to prevent a variation in these elevations greater than their normal fluctuation.

4. To so conserve and make use of these waters for irrigation, power, industrial development, and other purposes, as to create the greatest benefits.

5. To maintain conditions of river flow for the benefit of domestic and sanitary uses of this water.

In order to accomplish these purposes the project should be operated by an unprejudiced agent in a fair and efficient manner, equitable to all parties having interests therein, and in conformity with the following particular stipulations:

(a) The Green Mountain Reservoir, or similar facilities, shall be constructed and maintained on the Colorado River above the present site of the division dam of the Shoshone power plant, above Glenwood Springs, Colo., with a capacity of 152,000 acre-feet of water, with a reasonable expectancy that it will fill annually. Of said capacity, 52,000 acre-feet of water stored therein shall be available as replacement in western Colorado, of the water which would be usable there if not withheld or diverted by said project; 100,000 acre-feet shall be used for power

purposes; and all of said stored water shall be released under the conditions and limitations hereinafter set forth.

(b) Whenever the flow in the Colorado River at the present site of said Shoshone diversion dam is less than 1,250 cubic feet per second, there shall, upon demand of the authorized irrigation division engineer or other State authority having charge of the distribution of the waters of this stream, be released from said reservoir as a part of said 52,000 acre-feet, the amount necessary with other waters available, to fill the vested appropriations of water up to the amount concurrently being diverted or withheld from such vested appropriations by the project for diversion to the eastern slope.

(c) Said 100,000 acre-feet shall be stored primarily for power purposes, and the water released shall be available, without charge, to supply existing irrigation and domestic appropriations of water, including the Grand Valley reclamation project, to supply all losses chargeable in the delivery of said 52,000 acre-feet of water, and for future use for domestic purposes and in the irrigation of lands thereafter to be brought under cultivation in western Colorado. It shall be released within the period from April 15 to October 15 of each year as required to supply a sufficient quantity to maintain the specified flow of 1,250 cubic feet per second of water at the present site of said Shoshone diversion dam, provided this amount is not supplied from the 52,000 acre-feet heretofore specified. Water not required for the above purposes shall also be available for disposal to agencies for the development of the shale oil or other industries."

[R., Appendices B and C, pages 4 and 5]

Whereas the Project initially called for a capacity of 152,000 acre feet of water, the actual constructed capacity of the Green Mountain Reservoir is 154,645 acre feet, which has been accepted over the years as the decreed storage right. The manner of operation, maintenance and use of the Project was subject to the Colorado River Compact of November 24, 1922 (42 Stat. 171).

In 1949 the United States brought a federal action for a determination of its rights to the use of water in accordance with appropriations granted and held by the United States for the Colorado-Big Thompson Project, and for a declaratory judgment defining its operational obligations of the Green Mountain Reservoir as required under Senate Document No. 80. In 1955 this case was consolidated with several state water right adjudication cases which had been removed to the federal district court by the United States. Prior to trial, these cases, as consolidated, were substantially settled by the parties per a stipulation dated October 5, 1955, which was the basis for the judgment and decree entered by the United States District Court for the District of Colorado on October 12, 1955.

The stipulation, as incorporated in the judgment, provided, *inter alia* :

4. Notwithstanding their priority dates, the parties hereto further stipulate and agree that the parties to this cause will recognize the right to divert Blue River water by the City and County of Denver and the City of Colorado Springs for municipal purposes only, including domestic, industrial, yard, ground and park care, storage, fire, sewage, military and governmental, excluding, however, water for purposes of irrigation for agriculture, their rights as set forth in the decrees entered by the District Court of Summit County, Colorado, Water District No. 36, Civil Actions Nos. 1805 and 1806, which are part of the record in consolidated Cases Nos. 5016 and 5017; subject nevertheless to the following limitations:

(a) *The rights of the City and County of Denver and the City of Colorado Springs are limited solely to municipal purposes as herein described and subject to the rights of the United States of America to fill each year the Green Mountain Reservoir to a capacity of 154,645 acre feet for utilization by the United States of America in accordance with the "Manner of Operation of Project Facili-*

*ties and Auxiliary Features", contained in Senate Document No. 80, 75th Congress, 1st Session.*

This right to fill the reservoir as herein provided requires an amount of water (after provision for all prior rights) which added to the water in the storage in said Green Mountain Reservoir on a date between April 1st and May 15 to be fixed by the Secretary of the Interior each year in accordance with the plan of operation, would equal 154,645 acre feet had there been no releases from the storage in Green Mountain Reservoir. Provided, however, subject to the decision of the Secretary of the Interior that it will not adversely affect the ability of Green Mountain Reservoir to fulfill its function as set forth in the "Manner of Operation of Project Facilities and Auxiliary Features", contained in Senate Document No. 80, 75th Congress, 1st Session, except only as to the production of power, diversions by the City and County of Denver and Colorado Springs may be made from time to time as approved by the Secretary of the Interior after the snow pack estimate by the United States of America and a determination has been made that it is reasonably probable that the Green Mountain Reservoir will be filled during the season to the aforesaid capacity of 154,645 acre feet as measured herein.

(b) The City and County of Denver and the City of Colorado Springs in consideration of the agreement by the United States of America to permit the use of rights to the use of water by those municipalities as provided in this Stipulation will

(1) Deliver or cause to be delivered to the United States of America electrical energy at Green Mountain Substation or such other place or places to be designated by the Secretary of the Interior within a radius of eighty-five miles airline from Denver and all costs of delivery to be borne by the aforesaid municipalities.

(2) The electrical energy herein provided for will be delivered to the United States in substantially the same amounts, at approximately the same hours and at substantially the same rates of delivery that would have been generated by the Green Mountain Powerplant had it not been for the diversions of the waters by the municipalities in question.

[R., Appendix D, Vol. I, pp. 163, 164 and 165]

(Emphasis supplied.)

The stipulation also provided that:

It is stipulated and agreed by and between the parties to this stipulation that the Secretary of the Interior shall promptly present to the Speaker of the House of Representatives and the Vice President for transmittal to the proper Committees copies of this Stipulation, informing them of the course that has been adopted in regard to the subject matter of this Stipulation. If no Committee of the Congress has reported a bill disapproving this Stipulation and Final Decree entered thereon within 120 days from the date the 84th Congress, Second Session convenes, or if such a bill in any event is not passed and approved during said Congress, the agreements contained herein shall become binding and of full force and effect as among the parties.

It is understood and agreed between the parties to this Stipulation that if the proposed arrangement cannot be effectuated because of events described in Paragraph 11 of this Stipulation, then, and in that event without affecting the finality of the Judgment in these cases, the City and County of Denver and the City of Colorado Springs, or either of them shall have the right to present within a reasonable time to this Court for trial on the merits the sole question of whether, by reason of claimed "domestic" use they have a preferential right under the Colorado Constitution Article XVI, Section 6, or the Colorado River Compact, Article IV, irrespective of the prior rights of the United States of America in the Blue River for the purpose of generation of electrical energy to take and divert that water for their claimed "domestic" use.

[R., Appendix D, Vol. I, pp. 175 and 176]

Congress thereafter approved the stipulation of the parties in the Colorado River Storage Act, 43 U.S.C.A. § 620j (1956).

In 1963 Denver began storage at the newly completed Dillon reservoir and impounded virtually all of the Blue River flow. In the course of the litigation which followed, the United States and western slope parties contended that Denver's action violated the 1955 judgment and decree. At the pretrial conference Denver acknowledged that the Green Mountain Reservoir "has a right to fill to its full capacity each season before the City of Denver has any right to fill the Dillon Reservoir" [R., Vol. VII at p. 35]

On April 16, 1964, a decree was entered by the court and consented to by all the parties herein. This decree provided, *inter alia*: The October 12, 1955 judgment and Senate Document No. 80 "bind the parties hereto"; "Neither Denver nor Colorado Springs has any right, title, or interest in the Green Mountain Reservoir, or in the water which the United States may or is entitled to, store therein."; the United States has the right to fill Green Mountain Reservoir each year in accordance with the October 12, 1955, decree and Senate Document No. 80; Denver and Colorado Springs may not exercise their decreed right to divert the waters of the Blue River except with the approval by the Secretary of the Interior provided for in the October 12, 1955 decree and Senate Document No. 80; in granting Denver and Colorado Springs approval the Secretary shall determine the quantity of water necessary to fill Green Mountain Reservoir, and thereafter prepare a schedule for the filling of the Reservoir, with the understanding that until the "Reservoir is filled Denver shall hold in Dillon Reservoir waters captured by it during the same storage season to the extent the Secretary from time to time advises Denver that such waters may be needed to assure the filling of Green Mountain Reservoir"; and that this decree implements the October 12, 1955 decree and Senate Document No. 80 and is to be so construed.

Within several weeks after the 1964 decree was entered, the Secretary, on May 1, 1964, informed Denver that the snowmelt estimate indicated that approximately 60,000 acre feet of water could be captured in the Dillon Reservoir subject to later call if necessary to fill Green Mountain Reservoir. Approximately one month later the Secretary notified Denver that approximately 43,000 acre feet of the Dillon storage would be needed to fill Green Mountain Reservoir and that waters above that amount could be diverted. Denver suggested a proposal for the transfer of the water at a rate of 200 c. f. s. with adjustments as necessary to assure the filling of the Reservoir. Denver's proposal was accepted by the Secretary and the Reservoir was subsequently filled pursuant thereto. Thereafter, from 1964 to 1976, the parties apparently worked amicably without controversy relative to the operation of the Dillon or Green Mountain Reservoirs.

Below average snowfall in the western slope of Colorado during the 1976–1977 winter resulted in a significant decline in available runoff water in the Blue River in 1977. On July 8, 1977, the Regional Director of the Bureau of Reclamation notified Denver that 28,622 acre feet of Blue River water stored in Dillon Reservoir was needed to complete the Green Mountain Reservoir's 1977 annual capacity of 154,645 acre feet. On July 14, 1977 Denver notified the Regional Director that it would not release any Blue River water from the Dillon Reservoir to complete the Green Mountain Reservoir annual fill. This refusal precipitated the instant action.

On July 18, 1977 various motions were filed by the parties, requiring interpretations of the decree and document previously herein discussed. The Colorado River Water Conservation District moved for an order compelling Denver to release 28,622 acre feet of Blue River water from Denver's Dillon Reservoir. Other and similar organizations representing western slope interests joined in the motion. Denver moved to strike all motions and for a judgment "declaring that Denver has a right to require the United States to refrain from the

use of Green Mountain Reservoir or the water stored therein or the demands on the Blue River created thereby or the exercise of its storage right for the purpose of generating electric energy to the extent Denver requires such water for domestic use and pays or tenders payment therefor in energy as provided for in the Decree [October 12, 1955] herein." The United States also moved for an order compelling Denver to release the 28,622 acre feet of water from Dillon Reservoir.

The court, on November 2, 1977, after determining that only Denver's motion for declaratory relief and the United States' motion to compel need be decided, entered an order denying Denver's requested declaratory relief. In so doing, the court found, *inter alia* : The single issue before the court is whether Denver is entitled to divert for its use any of the water from the annual runoff of the Blue River before Green Mountain Reservoir fills or is assured of filling to its capacity (i. e., 154,645 acre feet) each year; there is no dispute over the United States' right to store 54,645 acre feet of Blue River runoff each year in Green Mountain Reservoir, that amount being required to replace the water diverted to the northeastern Colorado irrigators by the Colorado-Big Thompson project; the remaining 100,000 acre feet of Green Mountain Reservoir capacity and the United States' entitlement to sufficient water annually to fill that capacity, are the focal point of this controversy; Denver contends it has the right to acquire the water in question by notifying the Secretary of its desire to do so and tendering to him the amount of electrical energy that would be generated if the water were available to the United States; Denver predicates this theory on the fact that the 1955 decree incorporated Senate Document No. 80 under which the operation of the Colorado-Big Thompson project is subject to the provisions of the 1922 Colorado River Compact (R.S. § 37–61–101 (1973); Article IV(b) of the Colorado River Compact requires that any Colorado River water used for the generation of electrical power be utilized so as not to interfere with or prevent use of the same water for agricultural or domestic purposes; Denver contends that this article limits the right of the United States to the disputed water to a power generation right which is subservient to its (Denver's) intended domestic use of the water; Denver is not a project beneficiary under Senate Document No. 80 and the incorporation of the Colorado River Compact therein was only for the protection and benefit of project beneficiaries and parties to the Compact; the Colorado River Compact is limited to disputes between Colorado and other states and does not "apply to or interfere with the regulation and control by any state within its boundaries of the appropriation, use and distribution of water" ; the Colorado River Compact and Senate Document No. 80 do not bestow a domestic preference to Blue River waters on Denver, which is neither a Colorado-Big Thompson project beneficiary nor a party to the Colorado River Compact; Denver's rights and obligations with respect to annual runoff of the Blue River are established by the 1955 decree, under which Denver has the right to divert Blue River water after the Green Mountain Reservoir has been assured of filling each year; under the 1955 stipulation the parties thereto intended that approval or acceptance of the agreement by Congress would extinguish Denver's right to a trial determining the validity of its claimed domestic preference; surrender of the right to litigate this claim was a *quid pro quo* for the United States' agreement to allow Denver to divert Blue River runoff after the annual filling of the Green Mountain Reservoir was complete; Denver's claimed domestic preference to the water used to fill the reservoir each year was settled adversely to Denver when Congress approved the stipulation of the parties contained in the 1955 decree; the 1955 decree determined that the United States' right to the water was superior to Denver's; under the 1964 decree it was provided that Denver had no right, title or interest in the Green Mountain Reservoir or in the water which the United States may or is entitled to store therein; under the 1964 decree, which was denominated as an implementa-

tion of the 1955 decree, Denver could not divert the Blue River water except with approval by the Secretary; Denver and the United States stipulated on August 29, 1977 that in each of the years since 1964 (except 1964 and 1977) the Blue River water supply had been ample and that during these years the Regional Director had informed the parties when the Green Mountain fill had been completed and that they were released from any obligation to hold water to assure that filling; in 1964, another drought year, Denver did not allege it had a superior right to Blue River water retained in Dillon Reservoir; since 1964 the parties have cooperated admirably for thirteen years and Denver did not attempt to assert any domestic preference to the water used to fill the Green Mountain Reservoir, but rather, Denver remained content to exercise the rights created for it by the 1955 and 1964 decrees; that Denver acquiesced completely when the Bureau of Reclamation placed restrictions on the Blue River water stored in Dillon Reservoir prior to the filling of Green Mountain Reservoir each year; that the failure to assert the preference now urged indicates that the City has acknowledged that it has no present right to the water used to fill the reservoir each year; and at the very least, Denver's apparent contentment with the situation lulled the other parties into believing that the matter was conclusively determined in 1964.

On February 9, 1978 the court entered a supplemental judgment and decree in which it found, *inter alia*: the role of the United States in the operation of this project is that of a trustee responsible for the protection of western slope interest and delivering water to northeastern Colorado; the United States at Green Mountain Reservoir has a priority prior to any right in Denver for diversion or storage at Dillon Reservoir; the United States has a right to fill Green Mountain Reservoir once each year and Denver has no right, title or interest in the water which the United States may or is entitled to store therein; Denver has no right to require the United States to refrain from releasing water stored in Green Mountain Reservoir for any purpose so long as

that purpose is consistent with the judgments and decrees of this court of October 12, 1955 and April 16, 1964; under these decrees Denver may, prior to the completion of the annual filling of Green Mountain Reservoir under the senior right of the United States, store water out of priority if permitted to do so by the Secretary, under the terms of the 1955 and 1964 decrees, subject to release of said water by Denver on call of the Secretary to the extent required to complete the annual filling of Green Mountain Reservoir; following completion of the annual filling of Green Mountain Reservoir under the senior right of the United States, subject to the approval of the Secretary, Denver has a right to divert flows in the Blue River at Dillon Reservoir in contravention of the senior power generation right of the United States (which amount is 1725 c. f. s.) if such diversions by Denver would otherwise be in priority, provided acceptable arrangements for power replacement are tendered to the United States by Denver in accordance with the decrees; at any time, subject to the approval of the Secretary, Denver has a right to propose exchanges of water to be fulfilled from replacement storage owned or controlled by Denver on the Blue River or on the Williams River, provided the Secretary will not unreasonably withhold his consent to such exchange proposals if they comport with the provisions of the 1955 and 1964 decrees; this decree implements the 1955 and 1964 decrees and does not modify those decrees and does not vary, diminish, or change the rights or obligations of any party or beneficiary under these judgments and Senate Document No. 80.

On appeal, Denver presents the following issue for review: A declaration of the circumstances under which the United States can prevent Denver from exercising its preferential water rights at Dillon in favor of the United States downstream Green Mountain Reservoir and power plant on the Blue River. We cannot accept this as the proper statement of the issue. The issue decided by the District Court and the issue properly before us on appeal is whether

Denver is entitled to divert for its use any of the water from the annual runoff of the Blue River before Green Mountain Reservoir fills or is assured of filling to its capacity. This is the critical issue decided by the District Court in its judgment of November 2, 1977 and supplemental judgment of February 9, 1978.

In *United States v. Martin*, 267 F.2d 764 (10th Cir. 1959) we discussed the objectives of the Colorado-Big Thompson project:

> This project had for its primary objective the diversion of the waters of the Colorado River from the Western Slope to the Eastern Slope of the Rockies for irrigation purposes, by means of a system of reservoirs, canals and a 13-mile transmountain tunnel. The initial funds for the project were appropriated by the Act of August 9, 1937, 50 Stat. 595, "for construction in accordance with the plan described in Senate Document Numbered 80, Seventy-fifth Congress." The Document, embodying the salient features of the project, was Congressional sanction for a conciliation of conflicting interests of affected water users on both sides of the Rockies. The project, as described in the Document, contemplated a change in the regimen of the Colorado River with consequent modification of vested water rights on the Western Slope. And, it accordingly provided for the construction of reservoirs to impound and hold surplus waters for the primary purpose: "(1) to preserve the vested and future rights in irrigation: ", and "(5) to maintain conditions of river flow for the benefit of domestic and sanitary uses of this water."

267 F.2d at p. 766.

The position of the United States in implementing these projects under the Reclamation Act has consistently been that of a trustee, *City and County of Denver v. Northern Colorado Water Conservancy District*, 130 Colo. 375, 276 P.2d 992 (1954), obligated to perform as a "carrier and distributor of the water". *Ickes v. Fox*, 300 U.S. 82, 57 S.Ct. 412, 81 L.Ed. 525 (1937). It is also true, as noted by Denver, that the United States, while serving as Trustee, has maintained a "consistent thread of purposeful and continued deference to state water law". *California v. United States* (1978), 438 U.S. 645, at p. 653, 98 S.Ct. 2985, at p. 2990, 57 L.Ed.2d 1018. Even so we cannot agree with Denver's contention that the District Court's decree herein is in derogation of its preferential water rights established under Colorado law. We hold that Denver's participation in the Stipulation incorporated in the 1955 decree and the 1964 consent decree precludes Denver from advancing legal contentions contrary to the plain and unambiguous terms contained therein.

As previously noted, both the 1955 and 1964 decrees mandate that Denver's right to divert the waters of the Blue River is subject to the right of the United States to fill Green Mountain Reservoir each year. Under the 1955 decree, as found by the District Court herein, Denver waived its right to contend, at this late date, that it has a domestic preference to the waters in question.

Denver would have this court overlook the stipulation incorporated in the 1955 decree and the 1964 consent decree in which it freely and voluntarily participated. We cannot do so. A consent decree or order is to be construed for enforcement purposes basically as a contract. *United States v. ITT Continental Baking Co.*, 420 U.S. 223, 95 S.Ct. 926, 43 L.Ed.2d 148 (1975). Denver cannot be permitted to circumvent the rights afforded the signatories under the 1964 decree.

Similarly, Denver cannot, at this late date, circumvent the rights afforded the participants to the stipulation incorporated into the 1955 decree. Under the water laws of Colorado we must accord credibility to the stipulation. *Cline v. McDowell*, 132 Colo. 37, 284 P.2d 1056 (1955). This court, sitting as a "water court" in Colorado, must give effect to the stipulations of the parties. In *Colorado River Water Conservation District v. Bar Forty Seven Co.*, 579 P.2d 636 (Colo.1978) the Colorado Supreme Court, sitting *en banc*, held that a water court acted errone-

ously, arbitrarily and capriciously in refusing to give effect to a stipulation of parties in settlement of change of use of water rights without giving reasons supporting such refusal. No less a standard can be applied here.

■■ We cannot overlook or disregard stipulations which are absolute and unequivocal. *Rasmussen Drilling, Inc. v. Kerr-McGee Nuclear Corporation,* 571 F.2d 1144 (10th Cir. 1978) *cert. denied,* 439 U.S. 862, 99 S.Ct. 183, 58 L.Ed.2d 171; *Stubblefield v. Johnson-Fagg, Inc.,* 379 F.2d 270 (10th Cir. 1967). Stipulations of attorneys may not be disregarded or set aside at will. *United States v. Webb,* 595 F.2d 203 (4th Cir. 1979).

■ Applying these standards, we hold that the trial court properly denied Denver's requested declaratory relief. The Court did not err in granting the United States' motion to compel Denver to release 28,662 acre feet of water to Green Mountain Reservoir. Under the 1955 decree Denver's right to divert was "subject to the rights of the United States of America to fill each year the Green Mountain Reservoir to a capacity of 154,645 acre feet." Under the 1964 decree, it was established that Denver had no right in the Green Mountain Reservoir *or* "in the water which the United States may, or is entitled to, store therein". The 1964 decree further provided that Denver could not exercise its right to divert waters of the Blue River except with the approval of the Secretary and that Denver, in each instance, was obligated to hold in Dillon Reservoir such waters as "the Secretary from time to time advises Denver . . . may be needed to assure the filling of Green Mountain Reservoir." Under these circumstances Denver cannot now assert any rights which it stipulated away in 1955 and 1964.

AFFIRMED.